IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

BILLIE J. BELMONT,                    )
                                      )
                Plaintiff,            )          4:05CV3149
                                      )
        v.                            )
                                      )
JO ANNE BARNHART,                     )          MEMORANDUM AND ORDER
Commissioner of the Social            )
Security Administration,              )
                                      )
                Defendant.            )
_____

       Pursuant to the parties' consent, this case is pending
before me for final disposition.[1]  The plaintiff, Billie J.
Belmont ("Belmont") has appealed the decision of the defendant,
the Commissioner of the Social Security Administration
("Commissioner") denying her request for social security
disability insurance benefits.  After carefully reviewing the
record, I find that the Commissioner's decision should be
affirmed.


I.  PROCEDURAL BACKGROUND


       Belmont applied for Title II and Title XVI social security
benefits on September 10, 2002.  Belmont allegedly became
disabled on June 11, 2002 due to depression, mood swings,
anxiety, a learning disability, carpal tunnel syndrome, post
traumatic stress disorder, borderline intellectual functioning,
problems with her elbows, stress, migraines, and attention
deficit disorder.  AR 118-120, 256.  Her application was denied

_____

       [1]See filing 8, "Consent to Exercise of Jurisdiction by a
United States Magistrate Judge and Order of Reference," and 28
U.S.C. § 636(c).

initially on November 4, 2002, (AR 3, 84), and on reconsideration
on January 22, 2003.  AR 3, 89.

Belmont filed a hearing request on February 6, 2003, (AR 94-
95), and the hearing was held before an Administrative Law Judge
("ALJ") in Norfolk, Nebraska on April 28, 2004.  Testimony was
received from Belmont, who was represented by her counsel, Warren
L. Reimer, and a vocational expert who appeared at the ALJ's
request.  AR 28-31, 62, 107.  The ALJ's adverse decision was
issued on January 4, 2005, (AR 17-27), and Belmont's request for
review by the Appeals Council was denied on April 21, 2005.
Filing 1, (complaint) ¶ 4;  AR 2, 9-11.  Belmont's pending
complaint requesting judicial review and reversal of the
Commissioner's decision was timely filed on June 27, 2005.
Filing 1.


          II.   THE RECORD AND PROCEEDINGS BEFORE THE ALJ

At the time of her hearing, Belmont was thirty-one years
old, a licensed driver, and the custodial parent of her six-year-
old son.  AR 31-32, 58.  Belmont had attended special education
classes throughout grade school and high school, and graduated
from Norfolk High School in 1992.  AR 32-33, 129-135, 143, 266.
She can speak, read, and write English.  AR 79, 136-37.  Her full
scale IQ is 78; composed of a verbal IQ of 71 and a performance
IQ of 87.  AR 76, 290, 356.  Consistent with her IQ testing
results, in a 1998 medical report, Belmont's treating physician
noted that Belmont is "[n]ot tremendously well educated and seems
to certainly lack a fair amount of common sense."  AR 273.

Belmont has worked at a variety of semi-skilled and unskilled jobs, with physical demands varying from light to heavy.  See AR 65-66, 121-126, 138, 148-159, 186-193, 235-47. Belmont began working as a school cafeteria helper while she was still in high school.  AR 235.  Between the time of her 1992 high school graduation and March 1999, she worked for fourteen separate employers and held various positions.  She was employed as a line worker for a slaughterhouse; fed, moved, loaded, and unloaded cattle, sheep, and pigs for a livestock yard; worked on a "paint line" for a manufacturing company; and worked as deli counter help, a fast-food cook, a waitress, and a cashier.  AR 235-242.  Belmont left these positions to either explore new employment opportunities or due to pregnancy, physical injuries unrelated to her pending social security claim, fear of robberies occurring at her truck stop employment, being blamed for taking other waitress' tips, her son's illnesses, and in the case of the "paint line" position, her sensitivity to fumes and chemicals. AR 39-43, 63-65, 235-242.

Belmont was last employed as a part-time waitress for Greaser's Village Inn.  She had worked for this employer from March through July 1999 as a cook, and left the position due to transportation problems.  AR 243.  During this time frame, she filed a prior (and denied) claim for social security benefits, and she was evaluated by licensed psychologist, Julian Fabry, Ph.D.  Based on this evaluation, a medical consultant for the Iowa Disability Determination Services concluded:

> On the basis of medical and nonmedical evidence in file, the claimant does have mentally determinable impairments of Borderline Intellectual Functioning (especially with respect to verbal learning modes), Adult ADD with associated learning disabilities, Antisocial Personality Disorder and Adjustment Disorder

with mixed emotional and conduct features.  The
condition is severe, primarily with some impairments of
concentration.  Her activities of daily living and
social functioning are no more than slightly limiting.

[Belmont] should be able to do routine repetitive
work, although she may be a little slower in pace than
some.  She would have moderate difficulties handling
more detailed instructions, particularly if in written
form.  Ability to maintain attention and concentration
for extended periods is moderately impaired per her ADD
and assessed cognitive functions.  Her interpersonal
skills should be adequate for superficial interactions
with work personnel, but she might have some moderate
limitations in response to coworkers or supervisors
when criticized or challenged.  Her judgment at such
times would be moderately impaired, consistent with her
personality features.

The medical evidence is essentially consistent;
her assessed cognitive functions are consistent with
her academic history and reported functioning.  Her
allegations are credible to the extent she would be
somewhat slower than average in learning new or
detailed tasks.

AR 291.  See also AR 292-301.

From August 1999 through September 2001, Belmont worked for
six separate employers at various jobs, including as a waitress,
a cashier, a janitor, and as counter help in a fast-food
restaurant.  She left each of these positions after a short
period of time for a variety of reasons including her son's
illnesses, being unable to work nights due to child care
concerns, having carpal tunnel surgery, incurring a work-related
injury requiring stitches, and having her scheduled hours
reduced.  AR 243-47.

Greaser's re-hired Belmont as a part-time waitress in
September 2001, and she remained employed in that position until
she left the job in May 2002 for a higher paying full-time

4

position at Behlen's Manufacturing Company.  She injured her
thumb while working for Behlen's and was fired.  According to
Belmont, she was dismissed for being "accident prone," (AR 36-37,
177); according to Behlen's response to an SSA work performance
assessment questionnaire, she was dismissed for poor work
performance, her unwillingness to follow safety rules, her
defensive attitude when corrected by management, and her lack of
candor about prior injuries when completing her employment
application.  AR 206-214.

By July 2002, Belmont's thumb injury had healed and she was
released by her physician to return to normal activities.  AR
305.  Belmont was hired as a cashier for Cubby's in July 2002,
and she continued to work there until August 2002.  Cubby's was
satisfied with Belmont's job performance, and in response to an
SSA work performance assessment, stated "Billie did a good job
and got her work done in a timely manner," (AR 198), "you would
only have to explain and show her things once and she would
remember the next time she would have to do the chore," (AR 199),
"she was always friendly with everyone," (AR 200), "if I could
hire Billie back as an [sic] full-time employee I would be more
than happy to, but we don't have full-time positions," (AR 201),
and "Billie is missed here, it is sad that she chose not to show
up for work anymore."  AR 201.

Belmont claims she left her position at Cubby's in August
2002 due to illness.  AR 247.  She filed the social security
disability claim now pending before me on September 10, 2002, and
was assessed by Jane Zimmerman, LMHP,[2] on September 19, 2002.  AR

---

[2]"Licensed Mental health Practitioner;" see 172 Neb. Admin.
Code Ch. 94, "Licensure of Mental Health Practitioners and the
Certification of Marriage and Family Therapists, Professional

339-348.  Belmont told Zimmerman she had worked at Cubby's for
three days--from July 24, 2002 until July 26, 2002--and she left
that job because her medications made her unable to work.  AR
344.  Zimmerman concluded Belmont was suffering from severe
depression and assessed her Global Assessment of Functioning
("GAF") at 55.[3]

Belmont was first seen by her primary treating psychiatrist,
Pratrap Pothuloori, M.D., on October 5, 2002.  Like Zimmerman, he
concluded Belmont was suffering from severe depression and had a
GAF of 55.  He prescribed Zoloft, recommended that she continue
to see Zimmerman, and told Belmont to return in four weeks for
monitoring.  AR 333-335.  Belmont overslept and missed her
October 10, 2002 appointment with Zimmerman.  She reportedly had
no side effects from the Zoloft.  AR 336.

In October 2002, Belmont was re-hired for a third time by
Greaser's as a part-time waitress.  AR 205, 246-47, 254.  On
October 7, 2002, Greaser's responded to a SSA work performance
questionnaire and stated Belmont provided a satisfactory quality
and quantity of work.  Greaser's identified no problems with
understanding and carrying out work tasks, adapting to change,
working safely, making simple work-related decisions, maintaining
concentration and attention to work assignments, being dependable
and punctual in showing up for work, and appropriately

---

Counselors and Social Workers."

[3]A GAF of 51 through 60 is characterized by moderate
symptoms (e.g., flat affect and circumstantial speech, occasional
panic attacks) or moderate difficulty in social, occupational, or
school functioning (e.g., few friends, conflicts with peers or
coworkers).  See American Psychiatric Association, Diagnostic and
Statistical Manual of Mental Disorders, at 34 (4th ed.
2000)("DSM-IV-TR").

interacting with co-employees or supervisors.  Greaser's was
sufficiently satisfied with Belmont's performance to consider her
for full-time employment.  AR 202-05.

At the request of a disability determinations examiner,
Belmont was re-assessed by Dr. Fabry on October 21, 2002.  Dr.
Fabry concluded Belmont had no restrictions in daily living,
difficulty in social functioning, or recurrent episodes of
deterioration (withdrawal or exacerbation) when stressed.  He
found Belmont could sustain concentration and attention to
complete a task, understand and carry out short and simple
instructions with ordinary supervision, relate appropriately with
co-workers, and adapt to environmental changes.  AR 353.  His
evaluation noted that Belmont had sufficient cognitive ability
but lacked judgment in handling her own funds.  AR 352.

The record includes two separate state agency "Mental
Residual Functional Capacity Assessments" for Belmont.  The
first, completed by Dr. Lee Branham, Ph. D. in October of 2002
(see filing 13 (plaintiff's brief at p. 14) stated Belmont had no
limitations in:

- remembering locations and work-like procedures;

- understanding, remembering, and carrying out very short
  and simple instructions;

- maintaining regular and punctual attendance at work;

- sustaining an ordinary routine without special
  supervision;

- completing a normal work week without interruptions
  from psychologically based symptoms;

- relating with co-workers without distracting them or
  exhibiting behavioral extremes;

7

- maintaining socially appropriate behavior and adhering to basic standards of hygiene;

- traveling to unfamiliar places or using public transportation; or

- setting realistic goals and making plans independently.

Dr. Branham further concluded Belmont's ability to understand and remember detailed instructions was not significantly limited, and she had no limitation in her ability to carry out detailed instructions. Finally, Dr. Branham concluded Belmont was moderately limited in her ability to:

- maintain attention and concentration for extended periods;

- work with others without being distracted;

- make simple work-related decisions;

- interact appropriately with the public;

- ask simple questions and requesting assistance;

- accept instruction or criticism;

- adapt to changes in the work setting; and

- be aware of normal work hazards.

Dr. Branham did not find any marked limitations in any area assessed. AR 352-355. His summary of conclusions stated:

> Clmnt [sic] appears partially credible. She does have borderline to low normal range IQ and she consistently reports crying and beng [sic] short tempered. However, based on the overall evidence, she has only mild to moderate limitations in her functioning. She is independent in all ADL's, she has two good work reports from past employers and one hired her back. There is no evidence of marked limitations that would prevent her from performing work activity at an SGA level.

8

AR 356.

Nearly identical conclusions were reached by state agency doctor John W. Herdman, Ph.D., when Belmont was re-evaluated in January of 2003 upon reconsideration of the denial of her claim. AR 368.  Dr. Herdman concluded Belmont was not significantly limited in her ability to understand, remember, and carry out detailed instructions, set realistic goals, and complete a normal work week without interruptions from psychologically based symptoms.  AR 366-67.  These conclusions coincide with the observation of a third party friend who, in response to Belmont's 1999 claim for benefits, stated that although Belmont does not respond well to criticism, stressful situations, or change, she can function in a daily routine, does respond well to supervision, and can concentrate and maintain attention to a task.  AR 164-65.

In contrast, on March 14, 2003, Dr. Pothuloori concluded Belmont had severe disabilities which limited her ability to work.  He found Belmont could not satisfactorily follow work rules; relate to co-workers; deal with the public; use judgment; interact with supervisors; deal with work stresses; function independently; maintain attention and concentration; understand, remember and carry out complex, detailed, or simple instructions; maintain her personal appearance; behave in an emotionally stable manner; relate predictably in social situations; or demonstrate reliability.  AR 377-78.  He diagnosed her as having severe depression and mood swings, with moderate anxiety, noted that any kind of stress would further aggravate this condition, and stated Belmont's prescribed medication, Zolfoft, was only somewhat effective in treating Belmont's problems.  AR 379-80.  Dr.

Pothuloori's Mental Capacities Evaluation for Belmont described
her as markedly limited in nearly every area save one; Dr.
Pothuloori concluded Belmont was moderately limited in her
ability to travel.  AR 382-84.

Dr. Pothuloori's March 2003 report stated he began treating
Belmont in October 2002, her condition had not improved over
time, and it constantly interfered with her attention and
concentration.  AR 380.  However, his progress notes reflect the
following:

November 2, 2002:    Belmont's mood improved; she was sleeping
                     better and more hopeful.  There was some
                     improvement in her ADHD and impulse control,
                     though she continued to have problems paying
                     attention and encountered difficulty with
                     distractions.  She had no side effects from
                     her medication.  AR 440.

December 7, 2002:    Belmont was in a very happy mood; her affect
                     was very bright and she was doing very well
                     and no longer worrying a lot.  Family and
                     friends reportedly noticed a difference in
                     her.  She was able to function better, sleep
                     well, her appetite was good, and she was
                     pleasant and cooperative.  AR 439.

January 10, 2003:    Belmont was doing fairly well, and had no
                     side effects from her medications.  Her mood
                     had improved, she was much happier, and she
                     was not feeling hopeless, worthless, or
                     having suicidal ideations.  The only voiced
                     concern was her worry over a pending custody
                     battle.  She remained pleasant and
                     cooperative.  AR 438.

March 14, 2003:      Belmont's mood seems to be much more stable,
                     and she does not get as angry as she used to,
                     though she still has problems with
                     concentration and remembering things.  AR 435

March 29, 2003:      Belmont was not getting irritable or angry
                     like she used to.  Her mood was better, she

10

was happy and bright, pleasant and
cooperative, and able to handle stress well.
Her sleep and appetite were good.  She had no
side effects from her medication.  AR 436

Belmont had fifteen-minute appointments with Dr. Pothuloori
on a monthly or every two-month basis from March 2003 until
October 10, 2003.  AR 328-434.  During this period of time,
Belmont remained employed at her waitress job with Greaser's.
She was fired in December 2003 for failing to attend work.
Belmont claims she did not go to work because of icy roads.  AR
35.

On February 2, 2004 Belmont reported to the ALJ that her
condition had declined since she requested a hearing.  She
claimed she no longer went out, had bad headaches, had been
sleeping a lot over the last two years, and could no longer play
with her son, play hand video games of solitaire, carry heavy
things, push the vacuum, open doors, or carry trash or groceries.
AR 258.

On February 21, 2004, Belmont was again seen by Dr.
Pothuloori who noted that her progress to date was "Moderate,"
and her GAF had improved to 70.[4]  Belmont had quit taking her
medications in December, but when told her mood was declining,
began taking them regularly again in January.  "She is not as
depressed and anxious as she used to be.  Still has some mood

---

[4]GAF scores in the 61 to 70 range indicate "mild symptoms
(e.g. depressed mood and mild insomnia) OR some difficulty in
social, occupational, or school functioning (e.g. occasional
truancy, or theft within the household), but generally
functioning pretty well, has some meaningful interpersonal
relationships."  See American Psychiatric Association, Diagnostic
and Statistical Manual of Mental Disorders, at 34 (4th ed.
2000)("DSM-IV-TR").

swings.  Anger is much less than before."  Belmont was reportedly
sleeping fairly well, and experiencing no panic attacks.  AR 426.

    With respect to her physical problems, Belmont complained of
bilateral elbow, hand, wrist, and finger discomfort, but
electrodiagnostic studies performed in November 2002 were
essentially normal.  AR 364.  Radiographs of her right wrist and
elbow taken in January 2003 showed no significant pathology.
Belmont was instructed to continue using a brace on her right
wrist, but no restrictions were placed on the use of her wrist.
In December 2002, Belmont complained of chronic low back
problems, extending back five years, but according to her medical
records, back problems had not limited Belmont's activities.  She
complained of left knee pain, but radiographs of the knee were
also normal and no permanent physical restrictions were
identified.  AR 371-75, 387-91.  Belmont's medical record, read
as a whole, reflects a puzzling myriad of physical complaints.
As Belmont's treating physician noted in January of 1999, "Billie
just really gets dramatic with every little thing.  It's hard to
make sense of her complaints."  AR 269.

    Belmont claims she cannot work because she has
epicondylitis, carpal tunnel syndrome, and tendonitis in her
elbows.  She claims she is under too much stress, cannot learn
quickly enough, and has trouble sleeping, weakness, depression,
and agitation.  AR 47, 229, 248-49.  Belmont testified that her
hands go to sleep, lifting heavy items or writing for more than
five minutes causes wrist pain, (AR 53), and that once this pain
begins, she has to stop the activity and wait at least an hour
for the pain to subside.  AR 53.  She testified to having pain in
her arms (in the morning or at night) about ten percent of the
time, but acknowledged that the pain dissipates with medication.

12

AR 57-58.  According to Belmont, she has taken Skelaxin for her
upper extremity symptoms, and has no side effects from this
medication, but she failed to follow through with her prescribed
physical therapy.  AR 49, 55.

Belmont testified that she cannot concentrate or get along
with people, (AR 51), and gets stressed, (AR 52), but she does
not have difficulty being out in public.  AR 52.  Her September
2002 Disability Report explained:

> Due to my son's ADHD and Impulse Control Disorder I'm
> very stressed out and depressed that's why I'm losing
> my jobs & I can't concentrate at my jobs because
> everything is piling on top of me, my son's disability
> & his dad's heart problem my mother's problems.  Please
> let me go on disability so my stress is released.  so I
> don't worry how to pay bills, my son needs me all the
> time because his disability.

AR 174.  However, since June 2002, Belmont has volunteered at her
son's pre-school and school, and in that capacity, has supervised
10-15 children twice a week for 2-3 hours.  AR 43-44, 195.
Belmont also became a volunteer soccer coach in March 2004.

Belmont testified that she can sit in a comfortable chair
(the couch) eight hours a day, but in a straight-back chair for
only a couple of hours.  She stated who could stand a couple of
hours, and walk less than three hours.  AR 49, 54-55.  In answer
to interrogatories, Belmont stated she can walk for only a half a
block or a half an hour before having to sit or lie down.  AR
251.  She walks about twice a week.  AR 59, 253.  Belmont
testified that she plays video games every night for thirty to
forty-five minutes until her hands fall asleep; she was doing
this for several hours at a time until her doctor told her to cut
back.  AR 59-60.  Belmont drives a mile every day, pays her

bills, buys her own groceries, and handles her own money.  AR 60, 195-196, 251.  She prepares meals, does the dishes and laundry, cleans the house every day, and vacuums three times a week.  AR 194, 253.  She sleeps six hours every night, takes a one- or two-hour nap during the day, and watches three to four hours of television per day.  AR 68, 195-196.

Belmont testified that she could perform a cashier job, but only part-time due to low back pain.  AR 61.  She further testified that she cannot be a cafeteria worker because, at the time of the hearing, her son was not in school all day, (AR 62), and she cannot be a waitress due to wrist injury, weakness, and discomfort.  AR 62.

After the plaintiff testified, the ALJ posed hypothetical questions to the vocational expert.  The first hypothetical question asked the vocational expert to consider Belmont's age, education, and work experience, and further assume Belmont was able to:

- lift 20 pounds occasionally and 10 pounds frequently;

- stand and walk about six to eight hours a day;

- sit about six to eight hours a day;

- occasionally climb, stoop, kneel, crouch, and crawl;

- do occasional overhead lifting; and

- perform simple repetitive tasks.

Based on these assumptions, the vocational expert concluded Belmont could return to her past relevant work as a cafeteria, deli, or retail cashier.  AR 67-68.

14

The ALJ then asked the expert to assume Belmont must have limited social interaction.  With this added restriction the vocational expert concluded Belmont could not perform her past relevant work, (AR 68), but could do other types of work, such as bench work as a small products assembler (300,000 positions available nationally and 750-1000 positions available regionally), a final assembler of optical goods (40,000 positions available nationally and 450-500 positions available regionally), or a mail clerk (200,000 positions available nationally and 750 positions available regionally).

Assuming Belmont was restricted to only occasional use of her upper extremities (bilaterally) for fine manipulation, and she was also limited with respect to social interaction, the vocational expert opined that no jobs were available in the market.  AR 69-70.  However, the vocational expert also testified that absent a significant social interaction restriction, even with bilateral upper body restrictions on performing fine manipulation, Belmont could be an order clerk in the food and beverage industry (180,000 positions available nationally and 1200 positions available regionally), or a telephone quotation clerk (80,000 positions available nationally and 600-700 positions available regionally).  AR 70-71.

Finally, the vocational expert testified that if Belmont had psychiatric limitations that precluded her from performing simple repetitive tasks, no jobs were available in the market.  AR 71-73.

III.   THE ALJ'S DECISION.


On January 14, 2005 the ALJ issued a decision which
concluded Belmont was not entitled to disability insurance
benefits.  AR 21-26.  The ALJ evaluated Belmont's claims through
all five steps of the sequential analysis prescribed by 20 C.F.R.
§§ 404.1520 and 416.920, and made the following findings:

1.   The claimant is insured for Title II benefits through
     December 31, 2007;

2.   The claimant has not engaged in substantial gainful
     activity (SGA) since her alleged onset date.  Work
     activity subsequent to June 11, 2002 was not performed
     at a level that constitutes SGA;

3.   The claimant has the severe impairments of a depressive
     disorder and borderline to low normal intellectual
     functioning.  The claimant also has mild borderline
     carpal tunnel syndrome, which has been considered in
     combination with her other impairments without regard
     for its severity if considered separately;

4.   The claimant's impairments do not meet or equal an
     impairment in the Listing of Impairments at 20 C.F.R.
     Part 404, Subpart P, Appendix 1.

5.   The claimant's subjective complaints are not credible.

6.   The claimant has the residual functional capacity to
     deal with short, simple instructions, interact
     socially, lift twenty pounds occasionally, stand and
     walk for six hours in an eight-hour period, sit for six
     hours in an eight-hour period, and can perform
     occasional climbing, stooping, kneeling, crouching,
     crawling, and overhead lifting.

7.   The claimant is able to perform her past relevant work
     as a deli cashier, retail cashier, and cafeteria
     cashier.

8.   In the alternative, regarding the question of other
     work, the claimant is a younger individual with a high

16

school education and a history of semi-skilled and
unskilled work.

9.   Transferability of skills is not relevant to the
claimant's vocational profile due to her young age.

10.  There are other jobs existing in significant numbers,
and identified by the vocational expert, that the
claimant is able to perform.

11.  The claimant is not disabled at steps four and five of
the sequential evaluation process.

AR 26.

Belmont's request for a review of the ALJ's decision was
denied by the Appeals Council on April 21, 2005.  Filing 1,
(complaint) ¶ 4;  AR 2, 9-11.  Her complaint requests judicial
review of the agency's decision.  The matter is now fully
submitted for determination.


IV.   ANALYSIS


The plaintiff seeks reversal of the Commissioner's decision
and alleges the "final decision of the Commissioner denying the
Plaintiff's claim is not in accordance with the law and is not
supported by substantial evidence as required by 42 U.S.C. §§405
(g) and 1383(c)(3)."  Filing 1, (complaint) ¶ 7.  Specifically,
Belmont claims the ALJ's decision was erroneous because she:  1)
failed to accept as controlling the limitations and restrictions
placed upon the plaintiff by her treating psychiatrist, Dr.
Pratap Pothuloori; 2) failed to give the opinions of Dr.
Pothuloori the greatest weight based on his examining
relationship; 3) relied on the testimony of a vocational expert
(VE) in response to a hypothetical question which did not
consider all the plaintiff's medically documented limitations;
and 4) failed to properly assess the credibility of the

17

plaintiff's subjective allegations of physical and mental difficulties and conditions.  Filing 13 (plaintiff's brief at p. 8).

Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II, which in this case is the ALJ's decision.  A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole.  Hogan v. Apfel, 239 F.3d 958, 960 (8th Cir. 2001).  "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." Maresh v. Barnhart, 431 F.3d 1073, 1074 (8th Cir. 2005); Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2004)(quoting Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).  Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome.  Id.  See also  Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).

This court must also review the decision of the Commissioner to decide whether the proper legal standard was applied in reaching the result.  Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992).  Issues of law are reviewed de novo.  Olson v. Apfel, 170 F.3d 820, 822 (8th Cir. 1999); Boock v. Shalala, 48 F.3d 348, 351 n.2 (8th Cir. 1995); Smith, 982 F.2d at 311.

A.   Failing to Find Controlling or Defer to Dr.
     Pothuloori's Opinions Regarding Belmont's Mental
     Limitations and Restrictions.

     As applied to Belmont's mental limitations, the ALJ did not
accept Dr. Pothuloori's opinions as either controlling or
persuasive, and did not rely on those opinions when assessing
Belmont's restrictions and determining whether she was disabled.
Citing Burton v. Barnhart, No. 4:01CV3275 (D. Neb. August 19,
2002)(Kopf, J.), the plaintiff argues the ALJ erred by
substituting her medical opinions for those of the treating
psychiatrist.  "Clearly, the ALJ was wholly negligent in
complying with the requirements of SSR 96."  Filing 13
(plaintiff's brief at 10).

     The regulations require "that the adjudicator will always
give good reasons in the notice of the determination or decision
for the weight given to a treating source's medical opinion(s),
i.e., an opinion(s) on the nature and severity of an individual's
impairment(s)."  SSR 96-2p, 1996 WL 374188 at *5.  Factors to be
considered are: (1) the length of the treatment relationship and
the frequency of examination; (2) the nature and extent of the
treatment relationship (such as the kinds and extent of
examinations and testing); (3) supportability of the opinion (the
more a source presents evidence such as medical signs and
laboratory findings, the more weight will be given that source's
opinion); (4) the consistency of the opinion with the record as a
whole; and (5) whether the physician is a specialist, as more
weight is given to the opinion of a specialist about medical
issues relating to the area of specialty than to the opinion of a
source who is not a specialist.  20 C.F.R. §§ 404.1527(d) and
416.927(d).  See also SSR 96-2p, 1996 WL 374188 at *4.

From a psychological perspective, Dr. Pothuloori concluded Belmont had marked limitations rendering her unable to work.  The ALJ's report provides the following explanation for concluding Dr. Pothuloori's opinions should not be considered controlling and should be afforded little weight.

> I am not relying on the assessment forms completed by Dr. Pothuloori in March 2003 because they are inconsistent with his progress notes which show that the claimant improved and had only mild mental symptoms after she began taking Zoloft.  The only ongoing mental limitation that is supported by Dr. Pothuloori's notes is the inability to perform complex tasks due to concentration problems.  In addition, I note that there is no evidence of treatment from March 2003, which is when the forms were completed, until February 2004, when Dr. Pothuloori noted that the claimant was doing very well.  I have also considered note [sic] that the consultative examiner, Dr. Fabry, indication that the claimant has no limitation of mental functioning.  I find that Dr. Fabry's opinion is more objective and consistent with the evidence.

AR 24.

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).  If a treating physician's opinion is well-supported by medically acceptable clinical techniques and is not inconsistent with the other substantial evidence in the record, the opinion should be given controlling weight. Id.  Moreover, even if the ALJ concludes the treating source's medical opinion is not entitled to controlling weight, it may still be entitled to deference and be adopted by the adjudicator.  SSR 96-2p, 1996 WL 374188 at *1 (S.S.A., July 2, 1996).

20

"Generally, even if a consulting physician examines a claimant once, his or her opinion is not considered substantial evidence, especially if, as here, the treating physician contradicts the consulting physician's opinion." Lauer v. Apfel, 245 F.3d 700, 705 (8th Cir. 2001).  "A one-time evaluation by a non-treating psychologist is not entitled to controlling weight." Clark v. Apfel, 141 F.3d 1253, 1256 (8th Cir. 1998).  However, a treating physician's opinions must be considered along with all the evidence, and when those opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight.  Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002).  An ALJ may discount the opinion of a treating physician who has offered inconsistent opinions, (Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001)), and rely instead on the opinions of non-treating practitioners where those opinions are consistent with the entirety of the record. Smallwood v. Chater, 65 F.3d 87, 89 (8th Cir. 1995).  See also Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004)(opinions of non-examining, consulting physicians standing alone are not considered substantial evidence, but ALJ is entitled to rely upon such opinions where they are consistent with the record as a whole).

There is substantial evidence in this record supporting the ALJ's determination to disregard Dr. Pothuloori's opinions as neither controlling nor persuasive.  Dr. Pothuloori's own treatment notes for Belmont are strikingly inconsistent with his claim that Belmont was not improving with treatment, and his statements that she was markedly limited in nearly every area addressed in the Mental Capacities Evaluation are inconsistent with not only his progress notes, but Belmont's demonstrated ability to work at a level deemed acceptable by two separate employers.

Just prior to filing her claim for Social Security benefits, Belmont was successfully employed at Cubby's.  While Belmont was receiving treatment from Dr. Pothuloori, Belmont was able to work as a waitress for Greaser's, as a volunteer supervisor of preschool children, and as a volunteer soccer coach--each of which is inconsistent Dr. Pothuloori's claim that Belmont was unable to perform simple tasks, concentrate, remain attentive, or appropriately handle stress.  As noted by Dr. Branham, the record before the ALJ included "two good work reports from past employers;" one from Greaser's, which hired her three separate times, (AR 356), and the other from Cubby's, which reported that Belmont "did a good job. . . in a timely manner," (AR 198), did not need to be repeatedly taught how to do her assigned tasks, (AR 199), was friendly with everyone, (AR 200), and could be re-employed at Cubby's on a full-time basis if a position existed. AR 201.

Belmont was ultimately fired for not reporting to work in December 2003, a time period when the plaintiff's mental condition deteriorated because she voluntarily ceased taking her medications.  Belmont's condition improved when she resumed taking her prescribed medications; so much so that in February 2004, Dr. Pothuloori noted that her GAF had improved to 70, meaning Belmont was exhibiting "mild symptoms" or "some difficulty in social, occupational, or school functioning," "but generally functioning pretty well."  See footnote 4.

The totality of the record supports the ALJ's determination that Dr. Pothuloori's opinions of psychologically based restrictions, as set forth in his Mental Capacities Evaluation, were inconsistent with the record, and were therefore neither

22

controlling nor entitled to deference, especially when the opinions of similarly trained consulting experts were further supported by Belmont's demonstrated ability to work and the statements of her past employers.  I conclude the ALJ's decision should not be reversed based on a claim that the ALJ improperly disregarded Dr. Pothuloori's opinions.

>    B.    Failing to Properly Assess the Plaintiff's Credibility
>          Regarding Subjective Allegations of Physical and Mental
>          Difficulties and Conditions.

Belmont argues that the ALJ's decision fails to adequately detail the inconsistencies that she relied upon when deciding the plaintiff was not credible.  "From the record, . . . it is impossible to evaluate the process of determining the credibility employed by the ALJ."  Filing 13 (plaintiff's brief at p. 17).  Belmont claims the ALJ did not refer to or apply the standards required by the Eighth Circuit or Social Security regulations in explaining why she discredited the plaintiff's testimony.

To assess a claimant's credibility, the ALJ must consider all of the evidence, including prior work records and observations by third parties and doctors regarding daily activities, the duration, frequency, and intensity of symptoms, precipitating and aggravating factors, the dosage, effectiveness, and side effects of medication, and functional restrictions. Lowe v. Apfel, 226 F.3d 969, 971-72 (8th Cir. 2000)(citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)(known as the "Polaski factors").  The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole.  Id. at 972.

Where adequately explained and supported, credibility findings are for the ALJ to make.  Id.  (citing Tang v. Apfel, 205 F.3d 1084, 1087 (8th Cir. 2000)).

While the ALJ is permitted to discount a plaintiff's subjective complaints based on inconsistencies in the record as a whole, the ALJ must make express credibility findings and explain the record inconsistencies that support those findings. Dolph v. Barnhart, 308 F.3d 876, 879 (8th Cir. 2002).

> The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.  It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are [or are not] credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.  This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

Social Security Ruling (SSR) 96-7p, 1996 WL 374186, at *4 (July 2, 1996).  A deficiency in opinionwriting is not, however, a sufficient reason to set aside an ALJ's finding where the deficiency had no practical effect on the outcome of the case. Reeder v. Apfel, 214 F.3d 984, 988 (8th Cir. 2000).

The ALJ's written decision thoroughly and accurately described Belmont's testimony regarding her work history, her

24

complaints of upper extremity pain and prescribed medications, her typical daily activities, and her subjective complaints of physical and psychological limitations.  AR 23-24.  At the conclusion of this summary, the ALJ's decision states:

> I find that the claimant has medically determinable impairments that can reasonably be expected to produce the symptoms about which she complains.  However, her testimony as to the intensity, persistence, and limiting effects of her impairments is not credible. SSR96-7p.  The claimant's work activity during the period at issue is inconsistent with her allegations that she has been unable to work for a couple of years due to upper extremity impairments.  In this regard I note that the claimant left every job indicated for reasons other than disability.  She told the consultive examiner that her inability to work was due to the stress of being a single parent to a high-needs child. The claimant has been very active as a volunteer at her son's school, and she has coached her son's soccer team.  In addition to these activities, the claimant is able to perform typical household chores and errands, play video games for entertainment, take walks, and drive.  She testified that she has been looking [for] work since the alleged onset date.  When asked if she could do the cafeteria helper job that she did in the past, claimant said that she could not do it because her son is not in school all day.  This indicates that her reason for not working is that she takes care of her son.  I find that the claimant's continued use of the hand held video game is inconsistent with her allegations of upper extremity problems, particularly in light of the evidence showing that she failed to heed her physician's advice to stop playing video games.  The claimant has never reported any side effects from her medications.  Her own treating physician, Dr. Schafer, indicated that the claimant generally exaggerates her complaints.  The claimant has been treated for ongoing depression, which improved within a few weeks after she began taking medications.

AR 24.

The ALJ's written credibility determination is neither vague nor conclusory.  Though the ALJ she did not specifically cite to Polaski, she did cite to Social Security Ruling 96-7p.  Moreover, the ALJ discussed the Polaski factors; an ALJ is not required to discuss methodically each Polaski consideration.  Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000); Brown v. Chater, 87 F.3d 963 (8th Cir. 1996).

The ALJ specifically noted the contrast between Belmont's testimony of subjective complaints and limitations and her ability to work and conduct normal daily activities.  The ALJ noted that Belmont left several jobs, but never left due to the duration, frequency, or intensity of her physical complaints or mental limitations, and that even now, her stated reason for not returning to past relevant work was unrelated to any claim of disability.  She noted that Belmont's medication for depression was effective, and Belmont had no side effects from any medication.  She further noted that Belmont did not discontinue playing her hand held video game as directed by her doctor, and that her continued use of this hand held game is inconsistent with allegations of upper extremity problems.  See, e.g., Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir.1991)(a mixed record of compliance with doctor recommendations is an especially significant and legitimate reason to doubt a claimant's credibility about the severity of subjective complaints).  The ALJ also noted the observation of Belmont's treating physician and his conclusion that Belmont was prone to exaggerate her problems.

The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.  Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001).  Even if every

<u>Polaski</u> factor is not discussed in depth, deference must be given
to the ALJ's judgment where, as here, good reasons have been
given for discrediting Belmont's testimony.  See <u>Dunahoo v.
Apfel</u>, 241 F.3d 1033, 1038 (8th Cir. 2001).  I conclude the ALJ
has adequately and sufficiently explained her reasons for finding
Belmont was not credible, and the record as a whole supports this
credibility determination.  I therefore conclude the ALJ's
decision should not be reversed for failing to properly assess
Belmont's credibility, or for improperly concluding Belmont's
claimed level of impairment was not credible

   C.   <u>Relying on Vocational Expert Testimony Offered in
        Response to a Hypothetical Question That Failed to
        Include All the Plaintiff's Medically Documented
        Limitations</u>.

     Belmont claims the ALJ not only erroneously disregarded the
plaintiff's subjective complaints and Dr. Pothuloori's opinions,
but also erred in failing to consider the impairments found by
state agency evaluating psychologists, Drs. Branham and Herdman,
when posing questions to the vocational expert.  Citing <u>Hogg v.
Shalala</u>, 45 F.3d 276 (8th Cir. 1995), Belmont claims the
hypothetical question posed to the vocational expert did not
fully and accurately describe her limitations and therefore
cannot be relied on as substantial evidence.  "Failure to
incorporate uncontroverted medical opinions of the plaintiff's
treating doctor and of the doctors hired by the defendant to
evaluate the medical records as a part of the initial disability
determinations cannot result in a hypothetical question that
precisely and accurately describes the plaintiff."  Filing 13
(plaintiff's brief) at p. 15.

"The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004)(quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir.2000)). The ALJ bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence. Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000). However, a claimant's residual functional capacity is a medical question. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

The ALJ's decision states:

The record as a whole persuades me that the claimant had the residual functional capacity (RFC) to deal with short, simple instructions, interact socially, lift twenty pounds occasionally, stand and walk for six hours in an eight-hour period, sit for six hours in an eight hour period, and perform occasional climbing, stooping, kneeling, crouching, crawling, and overhead lifting. This RFC is based on the treatment notes from Dr. Pothuloori, which establish the existence of concentration problems. There is no evidence of any significant physical limitations. Based on the claimant's testimony that she continues to play hand-held video games for over thirty minutes at a time on a regular basis, I have not included any significant limitations affecting the use of the hands.

AR 24.

As the ALJ correctly noted, there is no medical evidence setting forth any physical restrictions on Belmont's ability to work. All objective medical testing was essentially normal. The ALJ found Belmont's testimony as to the intensity, persistence, and limiting effects of her alleged impairments was not credible, specifically noting that her allegations of upper extremity

28

problems were inconsistent with continuing to play hand held
video games.

It is well established that the plaintiff bears the burden
of coming forward with medical evidence to show that she suffered
from an impairment during the time she claims to have been
disabled.  See 20 C.F.R. § 404.1512(a),(c) & § 416.912(a),(c).
Based on the record before the ALJ, the lack of supporting
medical evidence, and the underlying determination that the
plaintiff's testimony of impairment was not credible, I conclude
that the hypothetical question posed to the vocational expert by
the ALJ need not have included any physical restrictions.  The
ALJ did, however, include some physical restrictions in the
hypothetical questions, and these restrictions were consistent
with the physical requirements of Belmont's prior jobs as
described in her testimony.  Including any physical restrictions
in the hypothetical questions was favorable to the plaintiff, but
minimally supported, if at all, by the evidence.  Belmont cannot
successfully claim she was prejudiced by the ALJ's lenient
interpretation of the evidence related to plaintiff's alleged
physical restrictions.  Any claim that the ALJ failed to
adequately identify the extent of Belmont's physical restrictions
is neither supported by the record, nor a basis for reversing the
ALJ's decision.

As to Belmont's alleged psychological impairments, Belmont
claims the ALJ failed to consider the medical opinions of state
agency doctors Branham and Herdman.  I disagree.  Though the
report does not address these doctors by name, the ALJ's
conclusion that Belmont was sufficiently able to handle short,
simple instructions and interact socially was entirely consistent
with the conclusions of Drs. Branham, Herdman, and Fraby.  Drs.

29

Branham and Herdman both found that Belmont had no limitations in
understanding, remembering, and carrying out short and simple
instructions, sustaining an ordinary routine without special
supervision, completing a normal work week without interruptions
from psychologically based symptoms, relating appropriately with
co-workers, and maintaining socially appropriate behavior.  They
further concluded Belmont had no significant limitation in her
ability to understand and remember detailed instructions, and no
limitation in her ability to carry out detailed instructions.
Dr. Fabry likewise concluded Belmont was sufficiently able to
concentrate and maintain attention to complete assigned tasks,
was able to understand and carry out short and simple
instructions with ordinary supervision, and could relate
appropriately with co-workers.  The ALJ's hypothetical question
incorporated these opinions, and it was fully supported by the
evidence of record.

     Belmont argues, however, that the ALJ did not incorporate
the moderate limitations identified by Drs. Branham and Herdman
into the hypothetical questions and therefore the questions were
incomplete.  Specifically, these psychologists concluded Belmont
was moderately limited in her ability to maintain attention and
concentration for extended periods of time, work with others
without being distracted, make simple work-related decisions,
interact appropriately with the public, ask simple questions and
request assistance, accept instruction or criticism, adapt to
changes in the work setting, and be aware of normal work hazards.

     As noted in the testimony, the critical question is the
meaning of the word "moderate" as used by the state agency
physicians.  The vocational expert testified that if the SSA's
definition of moderate limitations was applied to the findings of

30

Drs. Branham and Herdman, then he would conclude that Belmont was
unable to perform her past relevant work or the other potential
jobs identified by the expert because her impairments in
concentration, persistence, and pace would decrease productivity
below acceptable employment levels.  AR 71-72.

However, as the ALJ pointed out at the hearing, read in the
context of their ultimate conclusions, a person with "moderate
limitations" as that term is used by the state agency
psychologists remains able to perform simple, repetitive tasks.
AR 72-73.  Though he found that Belmont had moderate limitations
in several areas of mental functioning, Dr. Branham nevertheless
concluded "[t]here is no evidence of marked limitations that
would prevent her from performing work activity at an SGA level."
AR 356.  Similarly, Dr. Herdman concluded, "There are moderate
limitations as reflected in this [Mental Residual Functional
Capacity Assessment].  Claimant retains the capacity to handle at
least simple, routine tasks on a sustained and independent basis
and [is] capable of unskilled employment at SGA level."  AR 368.
The vocational expert testified that if moderate limitations, as
used by Drs. Branham and Herdman, means Belmont could still do
simple, repetitive tasks, she could perform the production
positions the expert had previously identified.  See AR 72-73.

Based on the totality of the testimony and the explanations
in the record, I conclude that the hypothetical questions posed
by the ALJ to the vocational expert were based on the medical
evidence of record, including the reports of Drs. Branham and
Herdman, and the hypothetical questions were not incomplete.  The
record substantially supports the ALJ's conclusion that those
"moderate limitations" identified by Drs. Branham and Herdman did
not render her unable to understand and follow short, simple

31

instructions, interact socially, or perform substantial gainful activities.  The ALJ's decision is not subject to reversal for allegedly failing to include all the plaintiff's medically documented limitations in the hypothetical questions posed to the vocational expert.


    IT THEREFORE HEREBY IS ORDERED:  The decision of the Commissioner of the Social Security Administration is affirmed. Judgment in accordance with this memorandum and order will be entered by separate document.

    DATED this 17th day of May, 2006.


                            BY THE COURT:

                            s/ *David L. Piester*
                            David L. Piester
                            United States Magistrate Judge

32